Rosa Maria **RIOS** et al., Plaintiffs,

v.

Henry P. **READ** et al., Defendants.

No. 75 C 296.

United States District Court,
E. D. New York.

Jan. 14, 1977.

Order Approving Notice Feb. 15, 1977.

Peter Bienstock, Puerto Rican Legal Defense & Education Fund, Inc., New York City, Oscar Garcia-Rivera, Herbert Teitelbaum, Richard J. Hiller, New York City, for plaintiffs.

Frederick L. Atwood, Pelletreau & Pelletreau, Patchogue, N.Y., for defendants.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, Chief Judge.

This is a case of first impression involving § 438(b)(2) of the General Education Provi-

sions Act, popularly known as the Family Educational Rights and Privacy Act of 1974 (the "1974 Act"), 20 U.S.C. § 1232g(b)(2) (Supp. IV, 1974). It also raises important questions concerning a school district's responsibility to provide remedial programs for students with limited English language ability.

The case is before us on a motion to compel answers to interrogatories, pursuant to Rule 37(a) of the Federal Rules of Civil Procedure. The individual plaintiffs are Puerto Rican and other Hispanic school children, and their parents, who reside in the towns of Patchogue and Medford in Suffolk County, New York. The complaint, framed as a class action, alleges that the defendants, school officials in the Patchogue-Medford School District, violated the plaintiffs' right to equal educational opportunity, protected by the fourteenth amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, by failing to provide programs, curriculum and teaching personnel adequate to remedy the plaintiffs' English language deficiencies. The action is brought pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3) and (4).

According to the complaint, each of the individual plaintiffs attends a public school in the Patchogue-Medford School District. Linguistically, these children are Spanish dominant and all allegedly have English language problems that prevent them from fully and effectively participating in their schools' English language educational programs. The plaintiffs contend that they are receiving inadequate instruction in the English language and, because their substantive courses are taught in English, they are unable to participate as fully as other Patchogue-Medford students in the learning process. Moreover, the complaint alleges that the defendants do not have an accurate method to identify students with English language deficiencies and, as a result, "the defendants regularly and frequently misclassify the English language ability and achievement of plaintiffs." In addition, because the defendants allegedly fail to evaluate regularly and accurately the plaintiffs' linguistic and academic progress, many students who do receive some bilingual instruction are prematurely transferred from such programs.

In an earlier opinion, this court granted the plaintiffs' motion for class action certification, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The members of the class are

Puerto Rican and Hispanic children attending school in the Patchogue-Medford School District who are unable to understand the courses taught in the district because of deficiencies in understanding the English language.

Memorandum Opinion, 75 C 296, at 6 (E.D. N.Y. Feb. 3, 1976).[1] According to the school district's Director of Pupil Services, in the academic year 1975–76, 730 children had Spanish surnames. Of these, 482 children had no English language problems. The remaining 228 received bilingual instruction from the 15 teachers in the Bilingual Education Department. The defendants claim that, as of December 31, 1975, only 80 children could not benefit from courses taught solely in English (Hauser affidavit).

## THE PLAINTIFFS' REQUESTS FOR DISCOVERY

The plaintiffs seek the following information and/or documents:

(1) names and number of students who were transferred by school authorities

---

1. In *Aspira of N.Y., Inc. v. Board of Education of N.Y.*, 394 F.Supp. 1161 (S.D.N.Y.1975), involving a *Lau v. Nichols* action against the New York City school system, the plaintiff class was certified as those Hispanic children whose

English language deficiency prevents them from effectively participating in the learning process and who can more effectively participate in Spanish.

*Id.* at 1162. Pursuant to a consent decree, the defendants agreed to provide a program for plaintiffs involving "intensive training in English language skills, instruction in substantive courses in Spanish, and reinforcement of Spanish language skills." *Id.* Moreover, the decree provided for a testing program to identify the members of the class, *i.e.*, those Hispanic children with English language deficiencies. *Id.*

from the bilingual program to all-English courses and/or programs (Interrogatories Nos. 11 and 12);

(2) documentation of progress achieved by students participating in the bilingual program (Interrogatories Nos. 18 and 19);

(3) documentation of progress achieved by students participating in the English-as-a-Second Language ("ESL") program (Interrogatories Nos. 26B–E, 27 and 28);

(4) information concerning the methods used to identify English language deficiencies in Spanish dominant children (Interrogatories Nos. 30–32);

(5) the names and numbers of Spanish dominant students who have English language deficiencies, including their grade and school (Interrogatory No. 33);

(6) the amount and source of funds allocated to the bilingual, ESL and other special programs for Spanish dominant students (Interrogatories Nos. 5G, 24G and 37G);

(7) information, including names, addresses and ethnic identity, concerning dropouts from Patchogue-Medford schools in the school years 1970–71, 1971–72, 1972–73, 1973–74, 1974–75 (Interrogatories Nos. 51 and 60);

(8) the test results for all Hispanic students, who, between 1972–76, were administered the Inter American Series Test of Comprehension of Oral Language (Interrogatory No. 56);

(9) a copy of the latest Student Population Survey compiled by the Director of Bilingual Education (Interrogatory No. 59);

(10) a document referred to as "The Stanford Results," which reflects the results of the Stanford Achievement Test administered to each Spanish surnamed child in the school district from September 1974 to present (Document Request No. 3);

(11) tests administered to school children in the district to determine whether the child should receive bilingual education or ESL (Document Request No. 4); and

(12) the class schedules and "bilingual identification cards" for every student who, since September 1974, participated in a bilingual education or ESL program in the district (Document Requests Nos. 17 and 18).

Although much of the information sought by plaintiffs has been supplied by defendants, the names and other identifying characteristics on the test results, class schedules, bilingual identification cards, etc., were deleted by the school authorities. Unless they can trace the progress of the individual students from the initial testing for English language deficiencies through the bilingual or ESL instruction and the students' eventual participation in regular English language courses, plaintiffs contend, the mass of data provided by defendants is useless. Without identifying data, plaintiffs claim it is impossible to determine which students were evaluated as language deficient; whether the language deficient students received adequate English language training; and whether, despite the bilingual programs offered by defendants, significant numbers of Spanish dominant students were academically disadvantaged by the defendants.

The defendants object to the discovery on the following grounds. First, they argue that under the Supreme Court's decision in *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), involving a similar challenge to educational practices in San Francisco schools, the only issue before this court "is whether or not the school district has taken affirmative steps to rectify the language deficiencies of students of Hispanic descent who by reason of such deficiencies are unable to participate in the regular school program." In their view, the interrogatories and requests for documents are directed at purely discretionary practices of the school district, such as the choice of language evaluation methods and the selection of remedial programs, when the district already has satisfied its obligations to Hispanic students under Title VI and the fourteenth amendment by the act of insti-

tuting an affirmative program to obviate English language deficiencies.

Second, the defendants assert that the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g (Supp. IV, 1974), prohibits them from disclosing the names, or other identifying information, of individual students in the Patchogue-Medford schools.

Finally, even if the 1974 Act is not a bar to disclosure of students' names, defendants claim that complying with the discovery requests would "probably cause great dissension and unrest and create enormous administrative problems for the school district" (Memorandum In Opposition to Plaintiffs' Motion to Compel Discovery, at 8).

We turn now to a discussion of each of defendants' objections to the discovery requests.

## LAU v. NICHOLS

In *Lau,* a class suit was brought by non-English speaking Chinese students against the administrators of the San Francisco Unified School District. The defendants' failure to provide special instruction in English to nearly 1,800 Chinese speaking students allegedly violated the Equal Protection Clause of the fourteenth amendment and § 601 of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d. Specific remedial programs were not urged by plaintiffs; rather, they asked only "that the Board of Education be directed to apply its expertise to the problem and rectify the situation." 414 U.S. at 565, 94 S.Ct. at 787.

The Supreme Court, reversing the lower courts, and without reaching plaintiffs' Equal Protection claims, held that § 601 entitled the plaintiffs to relief. That section provides that

[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Pursuant to § 602 of the 1964 Civil Rights Act, 42 U.S.C. § 2000d–1,[2] the Department of Health, Education, and Welfare's Office for Civil Rights had issued regulations, approved by the President, to further the broad objectives of § 601. In 45 C.F.R. § 80.3(b), HEW specified that recipients of federal aid may not

(i) Deny an individual any service, financial aid, or other benefit provided under the program;

(ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;

(iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program;

(iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program;

.    .    .    .    .

(vi) Deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program

.    .    .    .    .

In 1970, HEW issued clarifying guidelines, 35 Fed.Reg. 11595, addressed to the

---

**2.** Section 602 of the Civil Rights Act of 1964 provides in part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with re-

spect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President.

needs of English language deficient minority children:

> Where inability to speak and understand the English language excludes national origin-minority group children from effective participation in the educational program offered by a school district, the district must take affirmative steps to rectify the language deficiency in order to open its instructional program to these students.

This guideline further specifies:

> Any ability grouping or tracking system employed by the school system to deal with the special language skill needs of national origin-minority group children must be designed to meet such language skill needs as soon as possible and must not operate as an educational deadend or permanent track.

These regulations and clarifying guidelines bore substantially on the Supreme Court's reasoning in *Lau*. The stated policy of the California school system in 1974 was to insure "the mastery of English by all pupils in the schools," and no student could receive a high school diploma unless he or she was proficient in English. 414 U.S. at 565–66, 94 S.Ct. at 788, *quoting* Cal.Educ. Code § 71 (West 1969). Thus, unless students who could not understand the English language were provided with remedial instruction, their participation in an English language curriculum was meaningless. Since the San Francisco school district, a

recipient of federal education funds, had contractually agreed to comply with Title VI of the 1964 Civil Rights Act, as well as the HEW regulations, it was under an affirmative obligation to rectify the English language deficiencies of Chinese language dominant school children.[3] Accordingly, the case was remanded for the fashioning of appropriate relief.

In most respects, the facts alleged in the present case are quite similar to the circumstances in *Lau v. Nichols*. The plaintiffs are Hispanic children who attend a public school system which requires that,

> [i]n the teaching of the subjects of instruction prescribed by this section, English shall be the language of instruction, and text-books used shall be written in English . . ..

N.Y.Educ.Law § 3204(2) (McKinney Supp. 1975). The plaintiffs, because of their English language deficiencies, allegedly are unable to participate in the English language instruction offered by their school. Moreover, the school district, a recipient of federal education assistance, is under a contractual duty to comply with Title VI and the relevant HEW regulations.

However, unlike the circumstances of the *Lau* case and subsequent decisions that involved bilingual education, *e. g., Serna v. Portales Municipal Schools*, 499 F.2d 1147 (10th Cir. 1974), the defendant school district does provide a remedial program for English language deficient children.[4] *Com-*

---

3. In *Lau*, the school system conceded the standing of the plaintiffs "to sue as beneficiaries of the federal funding contract between the Department of Health, Education, and Welfare and the San Francisco Unified School District." 414 U.S. at 571 n. 2, 94 S.Ct. at 790 n. 2 (Stewart, J., concurring). Similarly, in the present case, the defendants do not contest plaintiffs' standing as beneficiaries of a similar contract.

4. In *Serna*, the plaintiffs, who charged the Portales, New Mexico, school district with discrimination against Spanish-surnamed pupils, established at trial that, until 1970,

> [n]one of the teachers in the Portales schools was Spanish surnamed, including those teaching the Spanish language in junior and senior high school; there had never been a Spanish surnamed principal or vice-principal

and there were no secretaries who spoke Spanish in the elementary grades.

499 F.2d at 1149. Moreover, despite an evaluation by the New Mexico Department of Education that the Portales schools were not meeting the language needs of their Hispanic children, the defendants

> neither applied for funds under the federal Bilingual Education Act, 20 U.S.C. § 880b, nor accepted funds for a similar purpose when they were offered by the State of New Mexico.

*Id.*

By contrast, the Patchogue-Medford schools employ seven bilingual teachers, fully fluent in Spanish, as part of a bilingual program that defendants claim has existed for more than 15 years (Atwood Affidavit, at 1–2). According to the defendants' answers to the second set of

pare *Morales v. Shannon*, 516 F.2d 411 (5th Cir. 1975). Further, the policy of the New York public school system does not require that course instruction be solely in English. The above-quoted section of the Education Law goes on to provide that for a period of three years, which can be extended by the State Commissioner of Education to a maximum of six years,

> pupils who, by reason of foreign birth, ancestry or otherwise, experience difficulty in reading and understanding English, may, in the discretion of the board of education, board of trustees or trustee, be instructed in all subjects in their native language and in English.

■ Despite the existence of a bilingual department in the Patchogue-Medford School District, and despite the stated policy of the New York public school system to encourage bilingual education, we reject defendants' interpretation of their educational obligations under Title VI and related regulations. The HEW guidelines, which emphasize that special programs to rectify language disabilities must not operate as "an educational deadend," clearly require a school or school district receiving federal funds to develop effective programs. It is not enough simply to provide a program for language disadvantaged children or even to staff the program with bilingual teachers; rather, the critical question is whether the program is designed to assure as much as is reasonably possible the language deficient child's growth in the English language. An inadequate program is as harmful to a child who does not speak English as no program at all.[5]

Although the language of the HEW regulations alone supports this interpretation of the obligation of a school district under Title VI, additional support exists in the legislative history of the 1974 amendments to the Bilingual Education Act, Title VII of the Elementary and Secondary Education Act, 20 U.S.C. § 880b *et seq.* (Supp. IV, 1974). The Bilingual Education Act provides financial assistance to local educational agencies to develop "new and imaginative elementary and secondary school programs designed to meet [the] special educational needs" of children of "limited English-speaking ability." 20 U.S.C. § 880b (1970). The House Report accompanying the 1974 amendments, which increased federal expenditures on bilingual programs, acknowledged the far-reaching implications of the Supreme Court's decision in *Lau v. Nichols*, and stressed the importance of bilingual education in the academic and personal growth of the language disadvantaged child:

> Bilingual education involves the use of two languages, one of which is English, as the media of instruction in a comprehensive school program. There is evidence that use of the child's mother tongue as a medium of instruction concurrent with an effort to strengthen his command of English acts to prevent retardation in academic skill and performance. The program is also intended to develop the child's self-esteem and a legitimate pride in both cultures. Accordingly, bilingual education normally includes a study of the history and culture associated with the mother tongue.

H.R.Rep.No.93–805, 93rd Cong., 2nd Sess. 66, *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 4148. Despite the increase in bilingual instruction since 1967,[6] the leg-

---

interrogatories, depending on the needs of the child, some students receive their substantive instruction in Spanish, others are taught substantive courses in English with supportive Spanish instruction; and some students are taught substantive courses in combinations of Spanish and English.

**5.** Indeed, § 204(f) of the Equal Educational Opportunity Act of 1974, 20 U.S.C. § 1703(f) (Supp. IV, 1974), makes it an unlawful educational practice for an educational agency to fail to take "appropriate action to overcome lan-

guage barriers that impede equal participation by its students in its instructional programs."

**6.** According to the legislative report accompanying the 1974 amendments to the Bilingual Education Act,

> [t]en States have passed legislation since 1967 permitting languages other than English to be used as media for instruction in the classroom. Prior to 1969, many of these States had laws expressly prohibiting such use.

islators found that many of the existing bilingual programs administered by local agencies were seriously deficient. Among the problems cited were lack of adequate teacher preparation and a "serious scarcity of trained bilingual teachers." H.R.Rep.No. 93–805, 93rd Cong., 2nd Sess. 68, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4148, 4149–50. Increasing the quantity of bilingual programs, in the view of the legislators, is meaningless without a concomitant emphasis on the quality of instruction received by the English language deficient child.

In addition to the deficiencies cited by the House Report, a bilingual program would be inadequate if its administrators failed to use adequate methods for identifying language deficient children, and thereby denied such children the opportunity to learn the English language, and if inaccurate evaluations of the students' progress in the bilingual program resulted in premature transfer of still language-deficient pupils to the regular English curriculum. In these circumstances, the English language-deficient child, despite the existence of a bilingual program at his school, is placed in precisely the same plight as the Chinese school children in *Lau* in that he will receive far less benefits from the school's curriculum than will be gained by the English speaking students.

■ The plaintiffs' complaint in this case alleges serious deficiencies, not only in the substance of the bilingual program in Patchogue-Medford, but also in the school district's methods for identifying language deficiencies and evaluating language progress. Since these allegations raise the core issue of the *Lau* case—the adequate preparation

of English language deficient children for their school's curriculum—discovery directed at the bilingual practices of the school district is entirely appropriate.

To put a final perspective on the defendants' position, it could hardly be argued that if a school district was found to violate the standards of *Lau v. Nichols* because it had failed to provide any bilingual education for language disadvantaged children, a court would be required to accept without scrutiny whatever remedial program the school district then proposed simply because the district now could claim that it was taking "affirmative steps." Indeed, in *Serna v. Portales Municipal Schools, supra,* after the trial court found that Spanish surnamed children in Portales, New Mexico, were denied equal educational opportunity because the Portales school district had failed to take affirmative steps to rectify their language deficiencies, the school district submitted a plan for remedial action. Rather than accept the proposed program, the trial court "fashioned a program which it felt would meet the needs of Spanish surnamed students in the Portales school system." *Id.* at 1154. On appeal, the Tenth Circuit Court of Appeals affirmed, concluding that there was substantial evidence that the proposed plan was only a token program that would not benefit the plaintiffs:

> [W]e believe the trial court, under its inherent equitable power, can properly fashion a bilingual-bicultural program which will assure that Spanish surnamed children receive a meaningful education.

*Id., citing Swann v. Charlotte-Mecklenburg Bd. of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).[7]

Massachusetts has even passed legislation mandating bilingual education wherever there are concentrations of children with limited English-speaking ability. Four States have passed legislation authorizing funds for the development of bilingual education. Another nine States have budget line items for bilingual education, even though there is no special State legislation.

H.R.Rep.No.93–805, 93rd Cong., 2nd Sess. 67, *reprinted in* [1974] U.S.Code Cong. & Admin. News, pp. 4148, 4149.

7. A significant question arises, which we need not decide at this time, as to the burden and nature of proof. *Lau v. Nichols* is not helpful in this regard, since Justice Douglas' opinion did not discuss the proof necessary for a prima facie case under Title VI. It may be that, in a case such as this, where the plaintiffs, unlike those in *Lau,* are receiving some exposure to bilingual education, analogy to Title VII of the 1964 Civil Rights Act is appropriate. Applying Title VII standards, the plaintiffs would first have to demonstrate that defendants' policies

## THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974

Section 438(b)(2) of the General Education Provisions Act, 20 U.S.C. § 1232g(b)(2) (Supp. IV, 1974), provides:

(2) No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information, or as is permitted under paragraph (1) of this subsection unless—

(A) there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents, or

(B) such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon condition that parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency.

In their response to interrogatories Nos. 12, 33, 51, 56, 59, 60 and document requests Nos. 3, 17 and 18, the defendants assert that the release of the names of pupils or other identifying data "is not authorized" by the 1974 Act. Two questions are posed by the defendants' objection. First, whether the 1974 Act, either by its terms or by virtue of the Congressional policy it expresses, bars disclosure of the pupils' names. Second, if the names must be disclosed, what type of notice must be given to the students and their parents, and whether an opportunity should be afforded for parents or students to object to disclosure.

Unfortunately, there is little guidance available to a court that must interpret this section of the 1974 Act. The entire 1974 Act itself, also known as the Buckley Amendment, after its principal sponsor, was offered as an amendment on the Senate floor to the bill extending the Elementary and Secondary Education Act of 1965. 120 Cong.Rec. S21487 (daily ed. Dec. 13, 1974) (joint remarks of Sen. Buckley and Sen. Pell). Since the amendments were not the subject of legislative committee inquiry, traditional legislative history in the form of hearings and reports is not available. Moreover, no decisions have been reported that interpret § 438(b)(2) of the 1974 Act. Thus, we write on a largely clean slate.

The purpose of the 1974 Act is two-fold. The legislation is intended

to assure parents of students, and students themselves if they are over the age of 18 or attending an institution or post-secondary education, access to their education records and to protect such individuals' rights to privacy by limiting the transferability [and disclosure] of their records without their consent. The Secretary of Health, Education, and Welfare is charged with enforcement of the provisions of the Act, and failure to comply with its provisions can lead to withdrawal of Office of Education assistance to the educational agency or institution.

120 Cong.Rec. S21487 (daily ed. Dec. 13, 1974) (joint remarks of Sen. Buckley and Sen. Pell). See Sen.Rep.No.93–1026, 93rd Cong., 2nd Sess. 186, *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 4250. The provision assuring privacy of student records, at issue in this case, was enacted in

---

create a discriminatory effect, *i. e.,* that significant numbers of Hispanic students have lagged behind English-speaking students in academic progress as a result of their failure to learn English and/or because they receive substantive instruction in a language they can not understand. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *See also Lau v. Nichols, supra* at 568, 94 S.Ct. at 789. Once this showing is made, the burden would shift to the defendants to establish that their bilingual program is genuinely designed and administered to meet the needs of English language deficient children and that alternative approaches would not produce a better result or would be unfeasible. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In any event, both parties should be prepared to brief and argue this issue prior to trial on the merits.

response to "the growing evidence of the abuse of student records across the nation." 121 Cong.Rec. S7974 (daily ed. May 13, 1975) (remarks of Sen. Buckley).[8] One study of record-keeping practices of school districts in various parts of the country found that:[9]

Within many school systems, few provisions are made to protect school records from examination by unauthorized school personnel.

Information about both pupils and their parents is often collected by schools without the informed consent of either children or their parents. Where consent is obtained for the collection of information for one purpose, the same information is often used subsequently for other purposes.

Access to pupil records by non-school personnel and representatives of outside agencies is, for the most part, handled on an ad hoc basis. Formal policies governing access by law-enforcement officials, the courts, potential employers, colleges, researchers and others do not exist in most school systems.

Sensitive and intimate information collected in the course of teacher-pupil or counselor-pupil contacts is not protected from subpoena by formal authority in most states.

121 Cong.Rec. S7974 (daily ed. May 13, 1975).[10]

It is obvious, however, that the 1974 Act does not provide a privilege against disclosure of student records. The statute says nothing about the existence of a school-student privilege analogous to a doctor-patient or attorney-client privilege. Rather, by threatening financial sanctions, it seeks to deter schools from adopting policies of releasing student records. Moreover, a school is not subject to sanctions because it discloses "personally identifiable information" if it does so in compliance with a judicial order. Yet inquiry cannot end here because, although the 1974 Act does not by its terms limit discovery of school records under the Federal Rules of Civil Procedure, the Congressional policy expressed in this provision places a significantly heavier burden on a party seeking access to student records to justify disclosure than exists with respect to discovery of other kinds of information, such as business records. The remarks of Senator Buckley, quoted previously, emphasize strongly that students have substantial privacy and confidentiality interests in their school records, *see also* Sen.Rep.No.93–1026, 93rd Cong., 2nd Sess. 186–88, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4251–52, and that "there [is] clear evidence of frequent, even systematic violations of the privacy of students and parents by the schools through the unauthorized collection of sensitive personal information and the unauthorized, inappropriate release of per-

---

8. The remarks by Senator Buckley consist of a speech given by the Senator to the Legislative Conference of the National Congress of Parents and Teachers on March 12, 1975, in which he discussed the 1974 Act. On May 13, 1975, Senator Buckley inserted the text of his remarks in the Congressional Record.

9. Section 438(a)(1) of the 1974 Act deals with access to student records, providing in part:

(a)(1)(A) No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children. If any material or document in the education record of a student includes information on more than one student, the parents of one of such students shall have the right to inspect and review only such part of such material or document as relates to such student or to be informed of the specific information contained in such part of such material. Each educational agency or institution shall establish appropriate procedures for the granting of a request by parents for access to the education records of their children within a reasonable period of time, but in no case more than forty-five days after the request has been made.

10. This study was conducted by the Russell Sage Foundation in the late 1960's. The above-quoted remarks, according to Senator Buckley, represent the conclusions of a conference of prominent educators, lawyers and social scientists. 121 Cong.Rec. S7974 (daily ed. May 13, 1975).

sonal data to various individuals and organizations." 121 Cong.Rec. S7975 (daily ed. May 13, 1975). These privacy violations are no less objectionable simply because release of the records is obtained pursuant to judicial approval unless, before approval is given, the party seeking disclosure is required to demonstrate a genuine need for the information that outweighs the privacy interest of the students. *See* Sen.Rep.No.93–1026, 93rd Cong., 2nd Sess. 187, *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 4251.[11]

In the present case, the plaintiffs have shown such a need. If the educational treatment of Hispanic children in Patchogue-Medford violates Title VI standards, it nonetheless would be impossible to prove unless the plaintiffs could trace the progress of the individual students. The need for records of individual student progress is particularly acute where the allegations concern the school district's methods of identifying language deficiency and evaluating the progress of students receiving bilingual training. It is impossible to determine, for example, if a student's English language problems were overlooked when he entered the school system unless examination is made of his subsequent academic progress and of the results of any language tests that were administered to him.

■ Furthermore, this action seeks to enforce Title VI of the 1964 Civil Rights Act and related regulations, as well as the fourteenth amendment. If the action had been brought by HEW, instead of the present plaintiffs, there is little doubt that government officials would have access to the school records. Section 438(b)(3) of the 1974 Act gives the Secretary of HEW access to student or other records

> in connection with the audit and evaluation of Federally-supported education programs, or *in connection with the enforcement of the Federal legal requirements which relate to such programs.*

20 U.S.C. § 1232g(b)(3) (Supp. IV, 1974) (emphasis supplied). *See* Sen.Rep.No.93–1026, 93rd Cong., 2nd Sess. 187, *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 4251. Moreover, on June 17, 1976, the Department of Health, Education, and Welfare issued final guidelines on the 1974 Act. These guidelines require, *inter alia,* that

> (a) Nothing in section 438 of the Act or this part shall preclude authorized representatives of officials listed in § 99.-31(a)(3)[12] from having access to student and other records which may be necessary in connection with the audit and

---

**11.** This section of the limited legislative history of the 1974 Act provides in part:

> In approving this provision concerning the privacy of information about students, the conferees are very concerned to assure that requests for information associated with evaluations of Federal education programs do not invade the privacy of students or pose any threat of psychological damage to them. At the same time, the amendment is not meant to deny the Federal government the information it needs to carry out the evaluations, as is clear from the sections of the amendment which give the Comptroller General and the Secretary of HEW access to otherwise private information about students. The need to protect students' rights must be balanced against legitimate Federal needs for information.

**12.** Section 99.31(a) of 45 C.F.R., 41 Fed.Reg. 24673 (1976) provides in part:

> § 99.31 *Prior consent for disclosure not required.*

> (a) An educational agency or institution may disclose personally identifiable information from the education records of a student without the written consent of the parent of the student or the eligible student if the disclosure is—

> (1) To other school officials, including teachers, within the educational institution or local educational agency who have been determined by the agency or institution to have legitimate educational interests;

> (2) To officials of another school or school system in which the student seeks or intends to enroll, subject to the requirements set forth in § 99.34;

> (3) Subject to the conditions set forth in § 99.35, to authorized representatives of:

> (i) The Comptroller General of the United States,

> (ii) The Secretary,

> (iii) The Commissioner, the Director of the National Institute of Education, or the Assistant Secretary for Education, or

> (iv) State educational authorities;

evaluation of Federally supported education programs, or in connection with *the enforcement of or compliance with the Federal legal requirements which relate to these programs.*

41 Fed.Reg. 24674 (1976) (to be codified at 45 C.F.R. § 99.35(a)) (emphasis supplied) (footnote added). Thus, a school or school district could not rely on § 438 to avoid disclosure to government officials of information that might reveal its noncompliance with Title VI and related regulations. It follows that, in view of the significant role of private lawsuits in ending various forms of discrimination in school systems, § 438 should not serve as a cloak for alleged discriminatory practices simply because litigation to end such practices is initiated by private plaintiffs rather than the government.

■ Since we find plaintiffs are entitled to the student records that are the subject of this motion, the next issue is the right of the parents and students to receive notice and to make individual objections. Section 438 directs that an educational institution under judicial order to disclose student records must notify the parents and students of the order prior to compliance. The type of notice required, however, will depend on the circumstances of each case. The new HEW guidelines state that an educational institution may disclose personally identifiable information pursuant to judicial order provided it

makes a *reasonable effort* to notify the parent of the student or the eligible student of the order or subpoena in advance of compliance therewith . . ..

41 Fed.Reg. 24673 (1976) (to be codified at 45 C.F.R. § 99.31(a)(9)) (emphasis supplied). Thus, where exceptionally large numbers of students are involved, it may be enough for a school or school district to publish the notice in a newspaper. This view is supported by a letter written on February 19, 1975, by the Assistant General Counsel for Education, Department of Health, Education and Welfare to the Department's General Counsel, describing the response to a query concerning § 438(b)(2)'s notice requirement:

(1) there is no legislative history as to whether publication would be adequate in the above-described circumstances; (2) we could not say as a matter of law that direct personal notice would be required in every case, absent regulations on the point; (3) however, at a minimum, some showing would have to be made that publication would be likely to reach the parents of the students, many of whom would presumably be of limited English-speaking ability; (4) the adequacy of the notice would depend on how reasonable it was under the circumstances.

■ In this case, involving several hundred students, appropriate notice could be effected either by publication or by mail. The notice must be in both Spanish and

---

(4) In connection with financial aid for which a student has applied or which a student has received. . . .

.    .    .    .    .

(6) To organizations conducting studies for, or on behalf of, educational agencies or institutions for the purpose of developing, validating, or administering predictive tests, administering student aid programs, and improving instruction; *Provided,* That the studies are conducted in a manner which will not permit the personal identification of students and their parents by individuals other than representatives of the organization and the information will be destroyed when no longer needed for the purposes for which the study was conducted; the term "organizations" includes, but is not limited to, Federal,

State and local agencies, and independent organizations;

(7) To accrediting organizations in order to carry out their accrediting functions;

(8) To parents of a dependent student, as defined in section 152 of the Internal Revenue Code of 1954;

(9) To comply with a judicial order or lawfully issued subpoena; *Provided,* That the educational agency or institution makes a reasonable effort to notify the parent of the student or the eligible student of the order or subpoena in advance of compliance therewith; and

(10) To appropriate parties in a health or safety emergency subject to the conditions set forth in § 99.36.

English *see* 41 Fed.Reg. 24672 (1976) (to be codified at 45 C.F.R. § 99.6(b)),[13] and it must describe the nature of this action, the parties, and the nature of the information that will be disclosed as a result of this court's order. In addition, the parents must be informed that on or before a date specified in the notice, prior to disclosure, they may bring to this court's attention any reasons why disclosure of their child's records should not be allowed.

We add this last requirement even though § 438(b)(2) does not mention the parents' right to a hearing. Under § 438(a)(2) of the 1974 Act, 20 U.S.C. § 1232g(a)(2) (Supp. IV, 1974),[14] however, which deals with the right of parents and students to inspect student records, provision is made for a hearing to challenge the content of the records in order to correct misleading or inaccurate data. Obviously, the right to inspect student records for inappropriate information is useless without an opportunity to contest the existence of such data in the record. It seems equally pointless to inform parents of the imminent disclosure of their childrens' records without affording at least some opportunity to contest the disclosure. We do not think Congress intended the right to notice of disclosure of school records to be less meaningful than the right to inspect for erroneous data.[15]

## BURDEN ON THE DEFENDANTS

The final objection of the defendants is that, even if the 1974 Act allows disclosure of identifying data in student records, compliance with a court order granting the requests for discovery places intolerable burdens on the school district. In the opinion of the defendants, the notice requirement, which would be the responsibility of the school district, will generate "great dissension and unrest" among parents. Moreover, the defendants claim that "[b]ecause of the multiplicity of records which reveal names or identities of students which are

13. Section 99.6 of 45 C.F.R., 41 Fed.Reg. 24671–72 (1976), provides as follows:

§ 99.6 *Annul notification of rights.*

(a) Each educational agency or institution shall give parents of students in attendance or eligible students in attendance at the agency or institution annual notice by such means as are reasonably likely to inform them of the following:

(1) Their rights under section 438 of the Act, the regulations in this part, and the policy adopted under § 99.5; the notice shall also inform parents of students or eligible students of the locations where copies of the policy may be obtained; and

(2) The right to file complaints under § 99.-63 concerning alleged failures by the educational agency or institution to comply with the requirements of section 438 of the Act and this part.

(b) Agencies and institutions of elementary and secondary education shall provide for the need to effectively notify parents of students identified as having a primary or home language other than English.

14. Section 438(a)(2) provides as follows:

(2) No funds shall be made available under any applicable program to any educational agency or institution unless the parents of students who are or have been in attendance at a school of such agency or at such institution are provided an opportunity for a hearing by such agency or institution, in accord-

ance with regulations of the Secretary, to challenge the content of such student's education records, in order to insure that the records are not inaccurate, misleading, or otherwise in violation of the privacy or other rights of students, and to provide an opportunity for the correction or deletion of any such inaccurate, misleading, or otherwise inappropriate data contained therein and to insert into such records a written explanation of the parents respecting the content of such records.

15. On the other hand, it does not follow that, in providing parents and students an opportunity to contest disclosure, we should adopt the sophisticated procedure suggested by HEW for challenging the existence of allegedly erroneous data in school records. For example, the HEW guidelines published in 41 Fed.Reg. 24673 (1976) (to be codified at 45 C.F.R. § 99.22)) envision an adversary proceeding including, if the parent or student desire, representation by counsel. In the context of a discovery proceeding under the federal rules, it should be sufficient that the parent or student has the opportunity to present to the court any specific reasons why disclosure of student records is undesirable or harmful to the student or his parents. This presentation should be in writing, particularly where the discovery involves large numbers of student records.

\*　　\*　　\*　　\*　　\*　　\*

sought by plaintiffs, it would be onerous, burdensome and a practical impossibility to require the school district to devise some method to conceal the names of individual students by substituting numbers or some other coded identification because of the mass of documents involved." (Memorandum in Opposition to Plaintiffs' Motion to Compel Discovery, at 8).

■ Section 438 of the 1974 Act does not require an educational agency to conceal the names of individual students as part of an authorized disclosure of school records. Data collected by authorized representatives of HEW in connection with the enforcement of federal legal requirements, under § 438(b)(3), must be protected

> in a manner which will not permit the personal identification of students and their parents by other than those officials, and such personally identifiable data shall be destroyed when no longer needed . . . .

20 U.S.C. § 1232g(b)(3) (Supp. IV, 1974). See 41 Fed.Reg. 24673 (1976) (to be codified in 45 C.F.R. § 99.31(a)(6)); 41 Fed.Reg. 24674 (1976) (to be codified in 45 C.F.R. § 99.35(b)). Although § 438(b)(2) does not mention the need for a protective procedure when disclosure to a private party is directed by court order, it would seem sensible to require in the disclosure order that the recipients of the student records avoid revealing the data to individuals unconnected with the litigation and destroy the data when it is no longer needed. But it is neither required or necessary that the defendants redact the names of the students from the records and substitute neutral identifying information. Thus, this aspect of defendants' objections on grounds of burdensomeness is without merit.

■ The defendants' objection that the notice requirement creates an unreasonable administrative burden must be rejected for several reasons. In the first place, as mentioned earlier, under HEW guidelines the school district is only required to make a reasonable effort to notify parents of impending disclosure. Notice in this case can be effected by publication or other reasonable method chosen by the school district. Second, in class actions that seek to vindicate civil rights guaranteed by the Constitution or federal statute the cost or inconvenience to a party is less weighty a factor than in other cases since there is a substantial public interest in enforcing these rights. See Burns v. Thiokol Corp., 483 F.2d 300, 304–05 (5th Cir. 1973); Rios v. Enterprise Ass'n Steamfitters, Local 638, 4 E.P.D. ¶¶ 7553, 7792 (S.D.N.Y.1971). Cf. Parents Committee of Public School 19 v. Community School Board, N. Y., 524 F.2d 1138, 1143 (2d Cir. 1975) (action under Bilingual Education Act, 20 U.S.C. § 880b et seq. (Supp. IV, 1974)); Maritime Cinema Service Corp. v. Movies En Route, Inc., 60 F.R.D. 587, 592 (S.D.N.Y.1973) (antitrust); Rockaway Pix Theatre, Inc. v. Metro-Goldwyn-Mayer, Inc., 36 F.R.D. 15 (E.D.N.Y.1964) (Mishler, Ch. J.) (antitrust). Finally, even judged by the standards applicable to discovery in non-civil rights cases, the administrative burden on the defendants is not so great as to justify denying the plaintiffs relevant information. See generally 4 Moore's Federal Practice ¶ 26.56[1] (1976).

For these reasons, the plaintiffs' motion to compel answers to interrogatories is granted. Defendants are directed to respond, consistent with this opinion, to interrogatories Nos. 12, 33, 51, 56, 59, 60, and document requests Nos. 3, 17 and 18. Reasonable notice must be provided to the parents of the children whose names will be disclosed. The notice, which must be in Spanish and English, should contain the following information:

1. the existence and nature of this action, including the identity of the parties;

2. a brief description of the court's order;

3. the limited use intended for the school records and that plaintiffs have been directed to avoid revealing any personal data to persons unconnected with the litigation;

4. that within two weeks following publication or mailing of the notice, any parent may object to the disclosure by

letter addressed to this court which sets forth specific reasons why disclosure would be harmful to the student or his parent.

The school district shall, within ten (10) days from the date of this opinion, advise the court as to the method of notice it chooses and serve and file a form of notice for the court's approval. Plaintiffs, within five (5) days after receipt of the proposed notice, shall serve and file any objections to defendants' proposed form of notice.

The court reserves the right to approve and/or modify the form of notice submitted by a further order annexed to this opinion.

It is

SO ORDERED.

### ORDER APPROVING NOTICE

It is hereby

ORDERED that the appended form is approved by the court (see memorandum of decision and order dated January 14, 1977), and it is further

ORDERED that the said notice shall be published at least once, on or before March 8, 1977, in the Long Island Advance (in English), and El Coqui (in Spanish), and it is further

ORDERED that notice (both in English and Spanish) shall be mailed to parents and/or guardians of children at their last known addresses, on or before March 7, 1977, as suggested by defendants.

### APPENDIX

NOTICE TO PARENTS OF PUERTO RICAN AND OTHER HISPANIC STUDENTS WHO ATTEND OR HAVE ATTENDED SCHOOL IN THE PATCHOGUE–MEDFORD DISTRICT

The Puerto Rican and other Hispanic students and their parents named above have sued the Patchogue-Medford School District in federal court. The plaintiffs represent Puerto Rican and Hispanic children who are unable to benefit from their courses because of problems in understanding the English language. They claim that officials of the school district failed to provide adequate programs and qualified teachers for the bilingual education department. The school district denies the charges.

The plaintiffs seek to obtain evidence that they believe will support their case, including information contained in the records of Puerto Rican and Hispanic students. In response to a law called the Family Educational and Privacy Act of 1974, the federal court has ruled that, while the plaintiffs are entitled to examine these records, the parents first must be given an opportunity to object to disclosure of their children's school records.

If no objections are made to disclosure, the information in the school records will be used only at the trial. During the trial, there should be no need to identify your child by name, address or parents. The law requires that personally identifiable data be destroyed when no longer needed.

The court will imply that you consent to disclosure of information in your children's school records unless you send a letter to the court indicating why you feel such disclosure would be harmful to you or your children. The letter must be received by the court before March 18, 1977, or you may appear in person on that day in Courtroom No. 5, in the federal courthouse in Brooklyn (see address below). The letter should be sent to

Chief Judge Jacob Mishler
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York

HENRY P. READ
Superintendent of Schools
Patchogue-Medford School District
Patchogue, New York 11772