754 P.2d 1145

**Harry A. DANIELSON, M.D., and Jane Doe Danielson, whose true name is Beverly Ann Danielson, husband and wife, Petitioners,**

**v.**

**SUPERIOR COURT OF the STATE OF ARIZONA, In and For the COUNTY OF MARICOPA, Honorable John Foreman, a judge thereof, Respondent Judge,**

**Joyce LOPEZ and Richard Lopez, husband and wife, Real Parties in Interest.**

No. 1 CA–SA 200.

Court of Appeals of Arizona, Division 1, Department A.

Dec. 8, 1987.

As Amended on Denial of Reconsideration March 14, 1988.

Review Denied June 7, 1988.

Weyl, Guyer, MacBan & Olson, P.A. by Daniel P. Jantsch and Michael L. Barth, Phoenix, for petitioners.

Eugene A. Burdick, and Robert J. Stephan, Jr., Phoenix, for real parties in interest.

## OPINION

GREER, Presiding Judge.

This special action petition requests review of the trial court's granting of a motion to compel discovery of petitioner's alcohol treatment center records. The trial court found that the privileged nature of these records was waived by petitioner's voluntary disclosure of them to the Arizona Board of Medical Examiners. We disagree.

Petitioner Harry A. Danielson, M.D., is one of the defendants in a medical malpractice lawsuit instituted by the real parties in interest, Joyce Lopez and Richard Lopez. Lopez alleges that during surgery Danielson perforated the dura surrounding her spine causing her serious injury. Her position is that Danielson was impaired by the use of alcohol both during surgery and throughout the course of her postsurgical recovery, and that this impairment contributed to the alleged malpractice.

Approximately two months after Lopez's surgery, Danielson voluntarily entered the alcohol rehabilitation center at St. Luke's Medical Center. In accordance with its statutory mandate, the Arizona Board of Medical Examiners (BOMEX) began an investigation of Danielson's fitness to practice medicine. *See* A.R.S. §§ 32–1401 to –1455. Shortly thereafter, Danielson entered into a stipulation with BOMEX that no disciplinary action would be taken upon Danielson's compliance with a number of conditions. The relevant condition here is that Danielson agreed to release to BOMEX all of the medical records relating to his treatment at St. Luke's.

After filing suit, Lopez served a subpoena on St. Luke's seeking Danielson's medical records. St. Luke's refused to supply the records, indicating that they could only be produced in compliance with "FEDER-

AL LAW (42–CFR PART 2)." In addition, Danielson refused to sign a release authorizing St. Luke's to produce the records.

Consequently, Lopez applied to the superior court for an order requiring St. Luke's to release the records or, in the alternative, requiring Danielson to sign a release. Following a hearing the trial court granted the motion, finding that the information sought was relevant, that Danielson waived any privilege claimed by releasing the medical records to BOMEX, and that good cause for release was shown pursuant to 42 U.S.C. § 290. Accordingly, the court ordered St. Luke's to produce the requested records.

From that order, Danielson brought this petition for special action. Since Danielson has no equally plain, speedy and adequate remedy by appeal, and the question presented is one of state-wide importance, we accept jurisdiction. A.R.S. § 12–120.21; Rule 1(a), Arizona Rules of Procedure for Special Actions; *U–Totem Store v. Walker*, 142 Ariz. 549, 691 P.2d 315 (App.1984).

Danielson does not take issue here with the trial court's finding that the information sought by Lopez is relevant. Rather, he alleges that the trial judge acted without precedent or legal support by holding that the release of the St. Luke's records to BOMEX constituted a waiver of the physician-patient privilege and finding that good cause for release existed pursuant to 42 U.S.C. § 290.

Communications between a physician and patient concerning any physical or mental disorder are privileged, and may not be obtained through pre-trial discovery absent a waiver. A.R.S. § 12–2235; *Ornelas v. Fry*, 151 Ariz. 324, 727 P.2d 819 (App. 1986). The privilege, however, is not absolute. "Any voluntary disclosure by the holder of such a privilege is inconsistent with the confidential relationship and thus waives the privilege." *United States v. AT & T*, 642 F.2d 1285, 1299 (D.C.Cir.1980). The privilege is also waived when the privilege holder places a particular medical condition at issue by means of a claim or affirmative defense. *Bain v. Superior Court*, 148 Ariz. 331, 714 P.2d 824 (1986). The scope of this type of waiver only extends to a condition which has been voluntarily placed at issue by the privilege holder. *Id.* at 335, 714 P.2d 824. Finally, the privilege cannot be used as "both a sword and a shield." *Throop v. F.E. Young Co.*, 94 Ariz. 146, 158, 382 P.2d 560, 568 (1963); 8 *Wigmore on Evidence* § 2388 (McNaughton Rev. 1961). That is, "a party cannot, by selective invocation of the privilege, disclose documents or testimony favorable to that party while failing to disclose cognate material unfavorable to that party." *Teachers Ins. and Annuity Ass'n v. Shamrock Broadcasting Co.*, 521 F.Supp. 638, 641 (S.D.N.Y.1981).

Within the context of a civil lawsuit involving only private interests, these principles would unquestionably apply and our supreme court's decision in *Bain*, 148 Ariz. 331, 714 P.2d 824, would be controlling. This case, however, involves more than just private litigants and interests in that it concerns the effect of a voluntary disclosure of information to an investigatory public agency, namely BOMEX. In similar situations, a number of federal courts[1] have suggested that, in order to encourage cooperation with government investigations, normal waiver principles should be applied only if a ruling that the disclosing parties have waived the privilege would not adversely affect the government's ability to investigate. *See, e.g., Diversified Industries Inc. v. Meredith*, 572 F.2d 596 (8th Cir.1977) (en banc). *See, generally, Teacher's Ins.*, 521 F.Supp. at 641.[2]

---

**1.** There is no Arizona case law concerning this precise issue. Although most of the federal cases discussed herein involve the attorney-client privilege, waiver of that privilege and the physician-patient privilege have been analyzed similarly in Arizona. *See, e.g., Bain*, 148 Ariz. at 333, 714 P.2d 824. Further, for the purposes of this analysis, it is not the specific privilege which is important, but the manner in which the privilege was used.

**2.** Other courts have held that a voluntary disclosure to an investigatory body constitutes an absolute waiver of an evidentiary privilege in a later proceeding. *See, e.g., In re Subpoenas Duces Tecum*, 738 F.2d 1367 (D.C.Cir.1984). We are convinced, however, that the unique charac-

These courts based their decisions on the overriding public policy of encouraging full disclosure to governmental investigators. They reasoned that an absolute waiver of the privilege would discourage cooperation for fear that the information, although otherwise privileged, could be used in subsequent litigation. *Schnell v. Schnall,* 550 F.Supp. 650, 652 (S.D.N.Y.1982). As noted in *Byrnes v. IDS Realty Trust,*

> '[i]t is apparent that voluntary cooperation with the Securities and Exchange Commission or with an Internal Revenue Service or grand jury investigation would be substantially curtailed if such cooperation were deemed to be a waiver of a corporation's attorney-client privilege.' ... [Such cooperation] should be encouraged rather than requiring that agency requests or subpoenas be fought to the hilt.

85 F.R.D. 679, 688 (S.D.N.Y.1980), *quoting In re Grand Jury Subpoena Dated July 13, 1979,* 478 F.Supp. 368 (E.D.Wis.1979).

Two dominant concerns clearly emerge: (1) whether public policy dictates that the privilege only be waived for the limited purpose of the governmental investigation; and (2) whether the disclosing party's acts are inconsistent with retention of the privilege. In our opinion, a finding of non-waiver of the physician-patient privilege due to a voluntary release of alcohol treatment center records pursuant to a BOMEX investigation is consistent both with the public policy of the State of Arizona and with a later assertion of the privilege.

BOMEX is responsible for licensing and regulating of medicine and surgery in Arizona and is authorized to investigate any evidence which might indicate that a doctor is incompetent, incapacitated, or guilty of unprofessional conduct. A.R.S. §§ 32–1401 to –1455. To carry out its responsibilities, BOMEX has full subpoena powers and may employ its own investigators and attorneys. A.R.S. §§ 32–1451.01(B), 32–1403(C). During an investigation, BOMEX is not restricted by the physician-patient privilege and may therefore acquire information that would otherwise be privileged and undiscoverable. Specifically, A.R.S. § 32–1451.01(D) provides that "[n]othing in this section or any other provision of law making communications between a physician and his patient a privileged communication shall apply to investigations or proceedings conducted pursuant to this chapter." In addition, a physician licensed to practice in Arizona has a duty to cooperate with a BOMEX investigation. Section § 32–1401(10)(cc) states that "[f]ailing to furnish information in a timely manner to the board or its investigators or representatives if legally requested by the board" is unprofessional conduct, subjecting the physician to possible disciplinary proceedings.

Clearly, the public policy of the state envisions BOMEX as having all the information it deems necessary to conduct a thorough and exhaustive investigation. The legislative combination of abrogating the physician-patient privilege and mandating physician cooperation has given BOMEX virtually unfettered investigatory powers.[3] Such sweeping investigatory ability is essential in light of the interest BOMEX was created to protect. *See generally,* A.R.S. § 32–1451. Aside from giving BOMEX the tools to carry out its investigations, these statutes also serve to encourage physician cooperation by sanctioning a failure to cooperate with BOMEX and by "automatically" dispensing with the physician-patient privilege pursuant to an investigation.

■ Without more, no waiver could be claimed had Danielson released confidential medical information pursuant to BOMEX's request. As noted, in general, a privilege is impliedly waived if the privileged material is voluntarily disclosed by the privilege holder. *United States v. AT & T,* 642 F.2d

---

teristics of a state investigatory agency mandate an analysis of the public policy considerations discussed in *Diversified* and its progeny.

**3.** A BOMEX subpoena, however, may be revoked, limited, or modified upon application to the Board or the superior court if the evidence required does not relate to unlawful practices covered by the statute, is not relevant to the charge being investigated, or if the subpoena does not sufficiently describe the evidence to be produced. A.R.S. § 32–1451.01(B)(1), (3).

at 1299. The effect of A.R.S. § 32–1451.01(D), however, is to foreclose any claim of implied waiver when medical records are obtained by BOMEX. BOMEX has the power to obtain a physician's medical records and, absent a subpoena that is irrelevant or unrelated to the pending investigation, there is nothing a physician can lawfully do to prevent disclosure. A voluntary disclosure of information to which there is no right to assert a privilege surely cannot be considered a waiver of the right to properly raise the privilege in the future. One cannot waive a non-existent privilege. This conclusion is buttressed by the fact that a physician has a duty to cooperate with a BOMEX investigation. Certainly, a physician is more likely to cooperate with BOMEX by releasing medical records when it is known that such records cannot be protected by asserting a privilege and that upon their release the privilege will be preserved against others. Thus, these statutes encourage disclosure by preventing "punishment by implied waiver" when a physician voluntarily releases medical records.

The United States Congress, however, has established something akin to an evidentiary privilege in respect to alcohol treatment center records. Section 290dd–3, 42 U.S.C., establishes additional confidentiality protection for such records and provides in relevant part:

**(a) Disclosure authorization**

Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to alcoholism or alcohol abuse education, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e) of this section, be confidential and be disclosed only for the purposes and under the circumstances

expressly authorized under subsection (b) of this section.[4]

**(b) Purposes and circumstance of disclosure affecting consenting patient and patient regardless of consent**

(1) The content of any record referred to in subsection (a) of this section may be disclosed in accordance with the prior written consent of the patient with respect to whom such record is maintained, but only to such extent, under such circumstances, and for such purposes as may be allowed under regulations prescribed pursuant to subsection (g) of this section.

(2) Whether or not the patient, with respect to whom any given record referred to in subsection (a) of this section is maintained, gives his written consent, the content of such record may be disclosed as follows:

. . .

(C) If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

**(c) Prohibition against use of record in making criminal charges or investigation of patient**

Except as authorized by a court order granted under subsection (b)(2)(C) of this section, no record referred to in subsection (a) of this section may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient.[5]

---

**4.** Subsection (e) applies to alcohol treatment center records within the Armed Forces or Veterans' Administration. It also exempts reports

under state law of incidents of suspected child abuse and neglect.

**5.** Although the language in subsection (c) would appear broad enough to limit the use of these

This statute does not preempt state privilege law, but serves as an additional layer of protection for alcohol treatment center records. 42 C.F.R. § 2.23 (1987). Accordingly, BOMEX could not successfully subpoena such records without complying with these federal provisions.

This additional federal protection drastically alters the investigatory system originally developed by our legislature. No longer is BOMEX unencumbered in its pursuit of all relevant medical information in respect to a doctor under investigation. In order to obtain a physician's alcohol treatment center records, either the physician must voluntarily waive this statutory protection or BOMEX must apply to a court for their release.

Such options were rejected by the legislature in enacting A.R.S. § 32–1451.01(D) which abrogates the physician-patient privilege during a BOMEX investigation. As explored earlier, this state's public policy, as evidenced by statute, is to encourage full disclosure of information to BOMEX. This end is accomplished, in part, by encouraging physician cooperation by statutorily waiving any physician-patient privilege which may be raised. Of course, this state policy cannot be asserted to exempt BOMEX from these federal provisions. However, this goal of full disclosure can be achieved in the identical way devised by the legislature; that is, by encouraging voluntary physician cooperation through removal of any possible claim of implied waiver of the physician-patient privilege. Thus, to remain consistent with legislative goals, there cannot be an implied waiver of the physician-patient privilege when a physician voluntarily releases alcohol treatment center records to BOMEX. Holding otherwise would most certainly defeat the legislative goal of full disclosure by discouraging cooperation and causing BOMEX "requests or subpoenas [to] be fought to the hilt." *Byrnes*, 85 F.R.D. at 688. Simply put, the legislature foreclosed any claim of implied waiver of the physician-patient privilege when a doctor voluntarily cooperates with BOMEX by releasing medical records, and we see no reason why such a claim should not be similarly foreclosed when a doctor voluntarily cooperates by releasing alcohol treatment center records.

Moreover, we do not believe that voluntary disclosure of alcohol treatment center records pursuant to a BOMEX investigation is inconsistent with a later assertion of the physician-patient privilege. The theoretical basis for an evidentiary privilege is that secrecy and confidentiality are necessary to promote the relationship fostered by the privilege. *von Bulow by Auersperg v. von Bulow*, 114 F.R.D. 71 (S.D.N.Y. 1987). *See also*, Advisory Committee's Note to Proposed Standard 511, Federal Rules of Evidence. Once this confidentiality is destroyed, the rationale behind the privilege is lost and the privilege may not be asserted in the future. *State v. Mincey*, 141 Ariz. 425, 687 P.2d 1180 (1984), *cert. denied*, 469 U.S. 1040, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984).

The central role of the confidentiality of a communication in determining whether a privilege will be considered waived is apparent from a review of the cases addressing this question. For example, in *Diversified*, the court held that as "Diversified disclosed these documents in a *separate and nonpublic* SEC investigation, we conclude that only a limited waiver of the privilege occurred." *Diversified*, 572 F.2d at 611 (emphasis added). A major factor in the *Byrnes* court's finding of non-waiver was the fact that the only disclosure of confidential information was made in a "nonpublic proceeding" before the SEC. *Byrnes*, 85 F.R.D. at 688. *See generally*, *von Bulow*, 114 F.R.D. at 78. Finally, the court in *In re Subpoenas Duces Tecum*, 238 F.2d at 1372, found a waiver, in part, because "the appellants had no reasonable basis for believing that the disclosed materials would be kept confidential by the SEC." *See also*, *Bucks County Bank v. Storck*, 297 F.Supp. 1122 (D.Haw.1969) (emphasizing the private nature of a suppression hearing in holding that testifying

---

records for investigatory purposes even if voluntarily disclosed, it is clear that this limitation was intended to be applied only to *criminal* investigations. *See* 42 C.F.R. § 2.65(c) (1987).

at such a hearing in a criminal prosecution did not waive the attorney-client privilege).

Here, it is clear that the BOMEX proceeding was "separate and nonpublic" and that Danielson had a strong expectation of confidentiality. Section § 32–1451.01(C) and (E) mandate confidentiality of BOMEX records and provide as follows:

C. Patient records, including clinical records, medical reports, laboratory statements and reports, any file, film, any other report or oral statement relating to diagnostic findings or treatment of patients, any information from which a patient or his family might be identified or information received and records kept by the board as a result of the investigation procedure outlined in this chapter shall not be available to the public.

. . . .

E. Hospital records, medical staff records, medical staff review committee records, and testimony concerning such records and proceedings related to the creation of such records shall not be available to the public, shall be kept confidential by the board and shall be subject to the same provisions concerning discovery and use in legal actions as are the original records in the possession and control of hospitals, their medical staffs, and their medical staff review committees. The board shall use such records and testimony during the course of investigations and proceedings pursuant to this chapter.

Further, any originally privileged material would remain privileged once in BOMEX's possession. *Lipschultz v. Superior Court,* 128 Ariz. 16, 623 P.2d 805 (1981).

In *Ex parte Rudder,* 507 So.2d 411, 413 (Ala.1987), the Alabama Supreme Court concluded that the defendant "did not waive his privilege by consenting to Dr. Rudder's production of his medical records to BOMEX and testimony before the Board for the reason that the disclosures to the Board were themselves privileged and confidential communications. *Jones on Evidence,* Vol. 7, § 212 at 747 (6th ed. 1972)."

The drafters of a California provision, Cal.Evid.Code § 912(c), which precludes waiver if the disclosure itself is a privileged communication explained the rationale behind such a holding:

The theory underlying the concept of waiver is that the holder of the privilege has abandoned the secrecy to which he is entitled under the privilege. Where the revelation of the privileged matter has taken place in another privileged communication, there has been no such abandonment.

Comment to § 912 Cal.Evid.Code. Thus, since by statute BOMEX is required to keep its investigations confidential, voluntary disclosure of records to BOMEX is completely consistent with a retention and later assertion of the physician-patient privilege.

Nonetheless, Lopez maintains that Danielson waived his privilege by using it inconsistently; that is, waiving it for his benefit as a "sword" with BOMEX and now using it as a "shield" against the plaintiff's discovery request. As discussed above, we reach the contrary conclusion—under these circumstances such uses of the privilege are absolutely consistent with each other and the rationale underlying the privilege. Further, this "sword/shield" analogy, also known as the patient-litigant exception to the privilege, was not developed in response to the type of situation presented here. As one commentator explained:

A shrinking from the embarrassment which comes from exposure of bodily disease or abnormality is human and natural. It is arguable that legal protection from exposure is justified to encourage frankness in consulting physicians. But it is not human, natural, or understandable to claim protection from exposure by asserting a privilege for communications to doctors, at the very same time when the patient is parading before the public the mental or physical condition as to which he consulted the doctor.... This in the oft-repeated phrase is to make the privilege not a shield only, but a sword.

*McCormick on Evidence,* § 103 (3d ed. 1984). Of course, Danielson is not here

"parading before the public the mental or physical condition as to which he consulted the doctor." His medical records are still confidential to the general public. He did not bring an action for damages arising from his condition, assert his condition as an affirmative defense, nor in any way put his medical condition at issue. *See, e.g., Bain,* 148 Ariz. 331, 714 P.2d 824. He merely cooperated with BOMEX in a separate, confidential proceeding.

Additionally, we note that Lopez's characterization of Danielson's cooperation with BOMEX is overstated in respect to the release of his alcohol treatment center records. Contrary to Lopez's suggestion, Danielson did not simply release these records in exchange for the ability to continue practicing medicine. This release was only one part of a litany of concessions made by Danielson, many of which are vastly more onerous than agreeing to release medical records, for example, random biological fluid testing, quarterly medical reports to BOMEX, and total abstinence from alcohol. The relative insignificance of this release provision of the stipulation is further evidenced by the fact that BOMEX could have obtained the records without the release, albeit not easily. *See* 42 U.S.C. § 290dd–3. Thus, even if this situation was within the patient-litigant exception, Danielson did not release his records as a "sword" to retain his medical license; the release was merely a minor part of a much larger agreement.

Finally, this is not a situation where a finding of non-waiver would be unfair to the party attacking the privilege. The petitioners have not established how the disclosure to BOMEX has prejudiced them in any way. *See, e.g., Throop,* 94 Ariz. 146, 382 P.2d 560. "The only prejudice that appears to arise is the prejudice that results wherever a party is deprived of information it would rather have. Such prejudice is neither caused nor acerbated by the disclosure of privileged information to [BOMEX] in a separate, nonpublic proceeding to which the plaintiffs were not a party." *Byrnes,* 85 F.R.D. at 689.

 In short, the legislature has devised a statutory system which encourages cooperation with and full disclosure to BOMEX during an investigation. In order to remain faithful to this legislative intent, there can be no implied waiver of the physician-patient privilege where medical records are voluntarily released to BOMEX. In such a situation, a later assertion of the privilege is consistent with the rationale underlying the doctrine of physician-patient privilege. Accordingly, we hold that a physician's voluntary release of alcohol treatment center records to BOMEX pursuant to an investigation does not constitute a waiver of the physician/patient privilege. We therefore grant special action relief and vacate the trial court's order compelling production.

Order vacated and case remanded.

GRANT and FROEB, JJ., concur.