160 P.3d 1204

**Andrew CATRONE, as next friend of Patrick Catrone, his minor child, Plaintiffs/Petitioners,**

v.

**The Honorable Robert E. MILES, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,**

**Mercy Healthcare Arizona, Inc., an Arizona corporation, dba St. Joseph's Hospital and Medical Center; Catholic Healthcare West, a foreign corporation, dba St. Joseph's Hospital and Medical Center; Louis G. Trunzo, M.D. and Joann Kolnick, husband and wife; North Valley Pediatrics, P.C., an Arizona professional corporation; North Valley Pediatrics–North Bell P.C., formerly known as North Valley Pediatrics–Tatum, P.C.; an Arizona professional corporation, Defendants/Real Parties in Interest.**

No. 1 CA–SA 06–0277.

Court of Appeals of Arizona, Division 1, Department B.

June 26, 2007.

Phoenix, Attorneys for Defendants Trunzo, Kolnick, North Valley Pediatrics, P.C. and North Valley Pediatrics–North Bell, P.C.

## OPINION

BARKER, Judge.

¶ 1 We treat in this special action several issues of first impression as to the discoverability of special education records. For the reasons that follow, we accept jurisdiction and deny relief from the trial court's order requiring their production in this case.

### Facts and Procedural History

¶ 2 On January 9, 1999, Patrick Catrone ("Patrick") was born at St. Joseph's Hospital and Medical Center ("St.Joseph's") to Andrew Catrone ("Father") and Stephanie Catrone. Patrick was discharged from the hospital the following day. Because Patrick experienced health difficulties, his parents brought him back on January 13, 1999. Patrick was diagnosed with hyperbilirubinemia [1] and treated. Father filed a medical malpractice suit against St. Joseph's and certain medical professionals who provided care to Patrick (collectively "Defendants"). Father alleges that Defendants were negligent in diagnosing and/or treating Patrick and that as a result Patrick has suffered severe and permanent injuries. The alleged injuries include hearing loss, sensory motor deficits, neurobehavorial problems, communication disorders, and impaired cognitive functions.

¶ 3 Patrick's brother, Austin Catrone ("Austin"), was born of the same parents approximately one year before Patrick. During the deposition of Father, Defendants discovered that Austin was also in special education for his learning disabilities. The disabilities included speech and comprehension difficulties and cognitive impairments. In support of the theory that Patrick's impairments were genetic and not the result of allegedly negligent medical practices, Defendants moved to compel the production of

Harris, Powers & Cunningham, PLLC by Frank I. Powers and John M. Matter, Phoenix, Attorneys for Plaintiffs/Petitioners.

Olson, Jantsch & Bakker, P.A. by Thomas G. Bakker and Jill L. Hirneisen, Phoenix, Attorneys for Defendant Catholic Healthcare West dba St. Joseph's Hospital and Medical Center.

Campbell, Yost, Clare & Norell, P.C. by Jeffrey J. Campbell and Erica J. Dickson,

1. Hyperbilirubinemia is "excessive concentrations of bilirubin in the blood, which may lead to jaundice." *Dorland's Illustrated Medical Dictionary* 628 (W.B. Saunders Co. 26th ed.1981). Bilirubin is "a bile pigment" that "normally circulates in plasma ... and is taken up by the liver cells." *Id.* at 167.

Austin's medical and academic records. Patrick objected.

¶ 4 The trial court initially ordered the production of Austin's medical and academic records within his special education files subject to a protective order limiting disclosure of the records. In the first special action filed in this case, we reversed as to the medical records, finding that they were privileged and undiscoverable. *Catrone v. Fields*, 1 CA–SA 05–0062 (Ariz.App. Apr. 21, 2005) (mem.decision) ("Memorandum Decision"). That issue is not before us in this special action.

¶ 5 Concerning the academic records, we noted that "[i]t is plausible that, within Austin's scholastic records is information dealing with the diagnosis and treatment of physical, behavioral, and mental disorders, which may be privileged." *Id.* at 9. At the time of the special action, the academic records had not been submitted for in-camera review in the trial court. *Id.* We "le[ft] consideration of any alleged academic record privilege to the superior court" on remand. *Id.* at 8–9 n. 5.

¶ 6 Defendants then filed in the trial court a motion for in-camera review of Austin's academic records. The trial court concluded that Father had not established a "Special Education Records Privilege." The trial court then ordered that the records be submitted under seal for in-camera review to determine if the records contained any information subject to the physician-patient privilege. After conducting an in-camera review of the records, the trial court ordered production of the documents with the exception of certain pages and redactions of information subject to the physician-patient privilege. Due to the "significant privacy concerns" at issue, the trial court also ordered that the parties agree to and present to it a protective order for the documents.

¶ 7 Father filed a motion for reconsideration requesting that the trial court review the academic records again and exempt from production additional information specified in a revised privilege log. Father also asked the trial court to reconsider the discoverabili-

ty of all the academic records on the grounds that Austin's privacy interests outweighed the need for the records. The trial court conducted a second in-camera review and specified further exemptions and redactions of information subject to the physician-patient privilege. The trial court denied the motion in all other respects, stating that "the fact that a school psychologist or physical therapist may have input into a student's educational evaluations and goals does not make the records related thereto 'medical records.'" This special action followed.

■■■ ¶ 8 Special action jurisdiction is highly discretionary. *See State ex rel. McDougall v. Superior Court*, 186 Ariz. 218, 219–20, 920 P.2d 784, 785–86 (App.1996). Jurisdiction is appropriate when there is no adequate remedy by way of appeal. *Sun Health Corp. v. Myers*, 205 Ariz. 315, 317, ¶ 2, 70 P.3d 444, 446 (App.2003). "Because an appeal offers no adequate remedy for the prior disclosure of privileged information, special action jurisdiction is proper to determine a question of privilege." *Id.* Accordingly, special action jurisdiction is appropriate here.

***Discussion***

¶ 9 Father raises three issues in this special action. First, are special education records protected by the medical records privilege created by Arizona Revised Statutes ("A.R.S.") section 12–2292 (Supp.2006)? Second, are special education records protected by an educational records and/or special education records privilege? Third, if they are not protected by privilege, did the trial court abuse its discretion in compelling production of the academic records? We address each issue in turn.

**1. *Medical Records Privilege***

■■■ ¶ 10 Father argues that Austin's special education records are privileged under the medical records privilege statute, A.R.S. § 12–2292.[2] The existence of a privilege is a legal issue that we review de novo.

---

2. Father contests on grounds of the medical privilege only the trial court's ruling on the motion for reconsideration, the revised privilege log, and

the documents submitted for the second in-camera review.

*State v. Miles,* 211 Ariz. 475, 477, ¶ 7, 123 P.3d 669, 671 (App.2005). "Privilege statutes, which impede the truth-finding function of the courts, are restrictively interpreted." *Church of Jesus Christ of Latter–Day Saints v. Superior Court,* 159 Ariz. 24, 29, 764 P.2d 759, 764 (App.1988).

¶ 11 "Unless otherwise provided by law, all medical records ... are privileged and confidential." A.R.S. § 12–2292. The term "medical records" refers to

> all communications related to a patient's physical or mental health or condition that are recorded in any form or medium and that are maintained for purposes of patient diagnosis or treatment, including medical records that are prepared by a health care provider or by other providers.

A.R.S. § 12–2291(5) (Supp.2006). "Health care provider" is any "person who is licensed pursuant to title 32 and who maintains medical records." *Id.* at (4)(a). As it pertains to our inquiry, title 32 requires licenses for medical doctors, physical therapists, psychologists,[3] occupational therapists, and behavioral health professionals. A.R.S. §§ 32–1455(A)(1) (2002) (medical doctors); 32–2021(A) (Supp.2006) (physical therapists); 32–2084(A) (2002) (psychologists); 32–3286(A) (Supp.2006) (behavioral health professionals such as social workers, counselors, and family therapists); 32–3421(A) (2002) (occupational therapists).

¶ 12 The United States Code of Federal Regulations defines special education as "specially designed instruction ... to meet the unique needs of a child with a disability, including—(i) [i]nstruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings." 34 C.F.R. § 300.26(a)(1) (July 1, 2006), *renumbered as* 34 C.F.R. § 300.39(a)(1) (effective October 13, 2006).[4] In the initial evaluation of the child, the evaluators must gather functional and developmental information to determine if the child has a disability and to determine the content of the child's individualized education program ("IEP"). 34 C.F.R. § 300.532(b) (July 1, 2006), *renumbered as* 34 C.F.R. § 300.304(b)(1) (effective October 13, 2006); 34 C.F.R. § 300.320(a) (July 1, 2006 and October 13, 2006). The regulations require that "[a]t least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech-language pathologist, or remedial reading teacher" participate in determining whether a child has a disability. 34 C.F.R. § 300.540(b) (July 1, 2006), *renumbered as* 34 C.F.R. § 300.308(b) (effective October 13, 2006). The IEP must include a statement of "[h]ow the child's disability affects the child's involvement and progress in the general curriculum." 34 C.F.R. § 300.347(a)(1)(i) (July 1, 2006), *renumbered as* 34 C.F.R. § 300.320(a)(1)(i) (effective October 13, 2006). The IEP must also contain "measurable annual goals" that meet the educational needs that result from the child's disability. *Id.* at (a)(2) (July 1, 2006 and October 13, 2006).

■ ¶ 13 Father objects to the production of special education records signed by a school psychologist, physical therapist, occupational therapist, or a speech therapist. These documents include written notices of evaluations, disability determinations, IEPs, and progress reviews. We note as a preliminary matter that a school psychologist need not be licensed according to title 32 if he or she is certified instead by the Department of Education. *See* A.R.S. § 32–2075(A)(1). Additionally, the medical records privilege does not apply to speech therapists as title 32 does not require licensing for speech therapists. *See* A.R.S. §§ 12–2291(4)(a) and 32–101–4161 (2002 & Supp.2006).

---

**3.** The chapter requiring a license for psychologists does not apply to a "school psychologist employed in a common school, high school or charter school setting and certified to use that title by the department of education if the services or activities are a part of the duties of that person's common school, high school or charter school employment." A.R.S. § 32–2075(A)(1) (Supp.2006).

**4.** The latest published edition of the Code of Federal Regulations was revised as of July 1, 2006. The Code was updated, however, on October 13, 2006, affecting the numbering of many of the regulations we cite here. The renumbering is yet to be reflected in the published version. We will therefore provide citations to both the July 1, 2006 published regulations, as well as their recent renumbering as of October 13, 2006.

¶ 14 The statutory privilege for medical records covers only those records that relate to the "physical or mental health or condition" of a patient and are "maintained *for purposes of patient diagnosis or treatment.*" A.R.S. § 12–2291(5) (emphasis added). While special education records do relate to the "physical or mental health or condition" of the student, they are created for the purpose of tailoring an educational program that will best accommodate the child's disability. The formulation of an educational plan for students with disabilities in a school setting is not the same as the diagnosis or treatment of a person with disabilities in a medical setting. Some of the records in the educational setting may be privileged and some may not. However, the participation of a school psychologist or therapist in the process does not alter the fact that much of the special education records are maintained for the purpose of education and not treatment. *See J.N. By and Through Hager v. Bellingham Sch. Dist. No. 501,* 74 Wash.App. 49, 871 P.2d 1106, 1115 (1994) (holding that records of student's evaluation by school psychologist were not subject to the psychologist-patient privilege because the student and his mother did not expect the communications to remain confidential and because "the purpose of the interview was to . . . assess[ ] [the student's] need for special education services," not "for the purpose of treatment or counseling").

■ ¶ 15 Accordingly, we hold that special education records are not protected in their entirety by the medical records privilege. In so doing, we recognize that certain information contained within special education records may be protected by the medical records privilege. The trial judge properly addressed this concern by conducting an in

camera review of the documents and withholding and redacting specific information protected by the medical privilege.[5] We further hold that the other records were not so privileged.

## 2. Alleged "Special Education Records Privilege"

¶ 16 Father next argues that the documents and information the trial court has required him to produce are subject to a special education records privilege created by state and federal law.[6] The existence of a privilege and issues of statutory interpretation are legal issues that we review de novo. *Miles,* 211 Ariz. at 477, ¶ 7, 123 P.3d at 671; *Stapert v. Ariz. Bd. of Psychologist Exam'rs,* 210 Ariz. 177, 179, ¶ 7, 108 P.3d 956, 958 (App.2005).

■ ¶ 17 Arizona law provides that

[t]he right to inspect and review educational records and the release of or access to these records, other information or instructional materials is governed by federal law in the family educational and privacy rights act of 1974 (20 [U.S.C.] §§ 1232g, 1232h and 1232i), and federal regulations issued pursuant to such act.

A.R.S. § 15–141(A) (Supp.2006). The Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g (2000 & Supp.2006), states the following concerning the release of educational records:

(2) No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory

---

**5.** Defendants have not argued in this special action or below that the trial court withheld documents or information that were not covered by the medical records privilege. The parties did not submit to this court and do not contest the withheld documents or redacted information from the trial court's first in camera review. Patrick has submitted to this court the documents included in the motion for reconsideration and reviewed in the second in camera review. In its order on the motion for reconsideration, the trial court exempted one listed document from production and indicated that it had high-

lighted information to be redacted on six other listed documents. As Defendants have not claimed the trial court highlighted for redaction information not covered by the medical records privilege, we do not review the highlighted information to determine if it does fall into the medical records privilege.

**6.** The documents subject to this argument include the documents that were the subject of the medical records privilege argument and all remaining documents.

information, or as is permitted under paragraph (1) of this subsection, unless—

(A) there is written consent from the student's parents specifying records to be released . . . or

(B) except as provided in paragraph (1)(J) [creating exceptions for subpoenas issued for Federal grand jury and law enforcement purposes], such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon condition that parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency.

20 U.S.C. § 1232g(b)(2). The federal regulations track the statute and allow disclosure without consent if "[t]he disclosure is to comply with a judicial order or lawfully issued subpoena." 34 C.F.R. § 99.31(a)(9)(i) (July 1, 2006 and October 13, 2006). Thus, there is no statutory bar precluding production of the records, only requirements that must be met before disclosure can occur.

¶ 18 In general, a privilege will protect records from disclosure even by court order. *See Ornelas v. Fry,* 151 Ariz. 324, 329, 727 P.2d 819, 824 (App.1986) (holding that plaintiffs may not compel discovery of a doctor's alcoholism treatment records pursuant to A.R.S. § 12–2235 (2003) (physician-patient privilege), in negligence action against doctor); *Bain v. Superior Court,* 148 Ariz. 331, 333, 714 P.2d 824, 826 (1986) (denying motion to compel discovery of records from sessions with psychologist pursuant to A.R.S. § 32–2085 (2002) (psychologist-patient privilege)). However, the legislature may create exceptions to statutory privileges. *Martin v. Reinstein,* 195 Ariz. 293, 320, ¶ 96, 987 P.2d 779, 806 (App.1999) (stating that statutory privileges, such as the physician-patient privilege, may be limited by the legislature, for example, by disregarding the privilege "in weighing the needs of parties to civil litigation"); *State ex rel. Udall v. Superior Court,* 183 Ariz. 462, 465, 904 P.2d 1286, 1289 (App.1995) (stating that statute abrogates physician-patient privilege in cases involving abuse of a child); *State v. Wilson,* 200 Ariz. 390, 394–95, ¶ 11, 26 P.3d 1161, 1165–66 (App.

2001) (stating that physician-patient privilege is not absolute as legislature has created exceptions). Thus, we must look at the statute that creates the statutory privilege to determine what "privileged" means in a specific context. The same is true of statutes that make certain records or communications "confidential." *See Hanson v. Rowe,* 18 Ariz. App. 131, 134, 500 P.2d 916, 919 (1972) (holding that statute making child welfare agency records "confidential" but disclosable pursuant to a court order did not create an absolute privilege for such records).

¶ 19 The above federal and state statutes do not use the term "privileged" with respect to educational records. The statutes do not create an independent privilege for educational records. *See also State v. Birdsall,* 116 Ariz. 196, 198–99, 568 P.2d 1094, 1096–97 (App.1977) (concluding that FERPA and the predecessor statute to A.R.S. § 15–141 permitted disclosure of school records pursuant to a subpoena duces tecum or other judicial order). Other jurisdictions have reached the same conclusion. *See Rios v. Read,* 73 F.R.D. 589, 598 (E.D.N.Y.1977) ("It is obvious . . . that [FERPA] does not provide a privilege against disclosure of student records."); *Victory Outreach Ctr. v. City of Philadelphia,* 233 F.R.D. 419, 420 (E.D.Pa.2005) (authorizing the release of personally identifiable information contained in educational records pursuant to a subpoena in a civil suit); *Anderson by Anderson v. Seigel,* 175 Misc.2d 609, 668 N.Y.S.2d 1003, 1005 (N.Y.Sup.Ct. 1998) *rev'd in part* 255 A.D.2d 409, 680 N.Y.S.2d 587 (N.Y.App.Div.1998) ("it is well settled that academic and school records generally are not protected by any privilege"); *Zaal v. State,* 326 Md. 54, 602 A.2d 1247, 1255 (1992) ("[FERPA] did not . . . create a privilege against disclosure of student records to be invoked by the school, the student, or his or her parents"); *Reeg v. Fetzer,* 78 F.R.D. 34, 36 (W.D.Okla.1976) (holding that educational records are not privileged under FERPA); *Gaumond v. Trinity Repertory Co.,* 909 A.2d 512, 517–19 (R.I.2006) (holding that FERPA and state law did not create an educational records privilege). At most, the federal and state statutes make educational

records "confidential," although FERPA does not use this term. Regardless of the term we apply, the protections afforded to educational records by statute do not prohibit, but rather permit, disclosure pursuant to court order. *See D.L. v. Unified Sch. Dist. # 497,* 270 F.Supp.2d 1217, 1244 (D.Kan. 2002), *aff'd in part, vacated in part on other grounds,* 392 F.3d 1223 (10th Cir.2004) ("The regulation at issue [34 C.F.R. § 99.31(a)(9)(i) ] clearly provides that otherwise confidential information may be disclosed pursuant to court order.").

¶ 20 Father also argues that the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401–1482 (2000 & Supp.2006), creates a privilege for special education records. The IDEA states that "[t]he Secretary shall take appropriate action, in accordance with § 1232g of this title, to ensure the protection of the confidentiality of any personally identifiable data, information, and records collected or maintained [by educational agencies] pursuant to this subchapter." 20 U.S.C. § 1417(c) (Supp.2006). One provision of the subchapter requires the states to develop, review, and revise an IEP for each child with a disability. 20 U.S.C. § 1412(a)(4) (Supp. 2006).

¶ 21 As with FERPA, § 1417(c) of the IDEA does not state that special education records are "privileged." The terms "privileged" and "confidential" are not interchangeable. *Ariz. Dep't of Econ. Sec. v. O'Neil,* 183 Ariz. 196, 197, 901 P.2d 1226, 1227 (App.1995); *see also Hanson,* 18 Ariz. App. at 133, 500 P.2d at 918 (holding that statute making child welfare agency records "confidential" but disclosable pursuant to a court order did not create an absolute privilege for such records). Instead, it provides special education records the protections accorded education records in general in 20 U.S.C. § 1232g. And, as set forth above, § 1232g does not create an independent privilege for educational records. Section 1232g allows educational records to be produced pursuant to judicial order or subpoena.

¶ 22 In sum, the federal and state statutes discussed above do not create an independent privilege for educational records in general or the subset of special education rec- ords. We recognize and respect that these records contain sensitive information, yet the legislative bodies involved have not created a privilege precluding production of this information.

## 3. Confidentiality of Special Education Records

¶ 23 In the alternative, Father argues that Austin has an expectation of privacy in his special education records that precludes their disclosure. This claim is based on the specific statutory language that provides for "confidentiality." As part of this argument, Father claims that Defendants must show, and have not, a need for the records that outweighs Austin's privacy interest. We review the trial court's decisions in discovery issues for abuse of discretion. *State Farm Mut. Auto. Ins. Co. v. Superior Court,* 167 Ariz. 135, 137–38, 804 P.2d 1323, 1325–26 (App.1991). We review any implicated legal issues de novo. *Miles,* 211 Ariz. at 477, ¶ 7, 123 P.3d at 671.

### a. The Applicable Standard

¶ 24 As previously noted, A.R.S. § 15–141(A) incorporates the provisions in FERPA relating to the release of and access to education records. While FERPA does not create a privilege in education records, it does limit the instances in which an educational agency can release such records. 20 U.S.C. § 1232g(b)(1). In addition, the IDEA refers to special education records as "confidential." 20 U.S.C. § 1417(c). These express statutory mandates recognize privacy interests in special education records that Father may invoke on behalf of his son.

¶ 25 We now turn to the impact that the confidentiality of the records has on their discoverability in the present special action. We emphasize that the issue here is not relevancy for admissibility at trial, but whether the standard for pre-trial *discovery* of the documents is met. "The requirement of relevancy at the discovery stage is more loosely construed than that required at trial." *Brown v. Superior Court,* 137 Ariz. 327, 332, 670 P.2d 725, 730 (1983). Discovery may extend to "any matter, not privileged, which

is relevant to the subject matter involved in the pending action" and "reasonably calculated to lead to the discovery of admissible evidence." Ariz. R. Civ. P. 26(b)(1).

¶ 26 There is a substantial disparity among the jurisdictions as to whether the confidentiality required by statute is a factor in considering discoverability or whether confidentiality is to be considered only by limiting the persons to whom the discoverable material can be disclosed. *See Rios*, 73 F.R.D. at 599 (holding by federal district court that before a court orders disclosure of educational records, "the party seeking disclosure is required to demonstrate a genuine need for the information that outweighs the privacy interest of the students"); *Zaal*, 602 A.2d at 1256 (holding by Maryland Court of Appeals that congressional policy evidenced by FERPA places "significantly heavy burden on the party seeking access to student records"); *Poole v. Hawkeye Area Cmty. Action Program*, 666 N.W.2d 560, 565 (Iowa 2003) (holding that the school records of the plaintiffs' nonparty siblings were admissible at trial when expert testimony established that the records were relevant according to standard relevancy test); *Anderson by Anderson*, 255 A.D.2d at 410, 680 N.Y.S.2d 587 (applying standard relevancy test to determine discoverability of academic and school records of plaintiff's mother and siblings); Jennifer Wriggins, *Genetics, IQ, Determinism, and Torts: The Example of Discovery in Lead Exposure Litigation*, 77 B.U. L.Rev. 1025, 1086–87 (1997) (arguing for restrictions on non-party discovery to protect privacy interests); Melissa E. Rosenthal, Note, *Liberal Discovery of Non–Party Records: In Defense of the Defense*, 7 Cardozo Women's L.J. 59, 81–82 (2000) (arguing that records of nonparties should be discoverable if shown to be relevant).

¶ 27 Applying Arizona law, we treat the statutory requirement of confidentiality to be an additional factor the trial court must consider before disclosure may occur. The trial court must first apply the traditional relevance standard to determine whether the records sought are "reasonably calculated to lead to the discovery of admissible evidence." Ariz. R. Civ. P. 26(b)(1). If the records sought meet this test, the trial court must then determine whether the statutory interest in confidentiality substantially outweighs the interest in the production of the documents. We phrase the test in this fashion for several reasons. First, limiting production of otherwise discoverable material impedes the truth-finding purpose of the courts:

> Testimonial exclusionary rules and privileges contravene the fundamental principle that "the public ... has a right to every man's evidence." As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."

*Trammel v. U.S.*, 445 U.S. 40, 50–51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (citations omitted); *see also United States v. Nixon*, 418 U.S. 683, 709–710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (discussing the importance of a complete presentation of evidence at trial); *Church of Jesus Christ of Latter-Day Saints*, 159 Ariz. at 29, 764 P.2d at 764 ("Privilege statutes, which impede the truth-finding function of the courts, are restrictively interpreted.").

¶ 28 Second, legislative bodies know how to specify that materials will be privileged, and not subject to disclosure, as opposed to confidential but nonetheless subject to disclosure. *See Estate of McGill ex rel. McGill v. Albrecht*, 203 Ariz. 525, 530–31, ¶ 20, 57 P.3d 384, 389–90 (2002) (rejecting argument that the legislature intended a showing of gross negligence when the statute spoke only of negligence because the "legislature surely knows how to require a showing of gross negligence, having used that term in a great number of statutes"); *State v. Ault*, 157 Ariz. 516, 520, 759 P.2d 1320, 1324 (1988) ("Because the legislature obviously knew how to require a jury finding when that was its intention and did not make such a provision here, we conclude that the legislature did not intend for seriousness to require a separate finding by the trier of fact."); *Roubos v. Miller*, 214 Ariz. 416, 420, ¶ 20, 153 P.3d 1045, 1049 (2007) ("The legislature knows

how to exempt proceedings when it wishes to do so, and it has not chosen to exempt civil infraction proceedings.") (citation omitted).

¶ 29 Neither the Congress nor the Arizona State Legislature made educational records privileged and not subject to disclosure; they only made them "confidential." Thus, to effect a total prohibition on disclosure of the records, as contrasted with a restricted confidential disclosure that the statutes permit, the proponent of non-disclosure must show that the statutory requirement of confidentiality is so great in a particular case that no restrictions on the extent of the disclosure will protect that statutory interest in confidentiality.

¶ 30 In determining whether the statutory interest in the confidentiality of the documents at issue substantially outweighs the interest in their production, the trial court should consider the following factors: (1) the strength of the relationship between the confidential information and the issue in dispute, see Zaal, 602 A.2d at 1261; (2) the harm that may result from the dissemination of the confidential information, see id. at 1262; (3) whether protective devices limiting the disclosure of the information (such as in-camera inspections and "need-to-know" orders) can significantly reduce the harm from dissemination, see Jolly v. Superior Court, 112 Ariz. 186, 191, 540 P.2d 658, 663 (1975); (4) whether the information can be obtained from "some other source that is either more convenient [or] less burdensome," see Ariz. R. Civ. P. 26(b)(1); (5) whether the party seeking to preclude production is the party that put the need for the documents at issue, see Danielson v. Superior Court, 157 Ariz. 41, 43, 754 P.2d 1145, 1147 (App.1978) (stating that physician-patient privilege is waived when party claiming privilege puts medical condition at issue); State Farm Mut. Auto. Ins. Co. v. Lee, 199 Ariz. 52, 61, ¶ 23, 13 P.3d 1169, 1178 (2000) (citing Ulibarri v. Superior Court, 184 Ariz. 382, 385, 909 P.2d 449, 452 (App.1995)) (stating that "a waiver [of the attorney-client privilege] can be implied when a party injects a matter that, in the

context of the case, creates such a need for the opponent to obtain the information allegedly protected by the privilege that it would be unfair to allow that party to assert the privilege"); and (6) any other factors pertinent to determining whether confidentiality should outweigh production. See Ariz. R. Civ. P. 26(c)(2) ("The burden of showing good cause for [a protective] order shall remain with the party seeking confidentiality.").

¶ 31 When a party makes a discovery request for material that the trial court has found discoverable pursuant to Rule 26(b)(1), the interests in confidentiality may typically be satisfactorily protected by in camera review and an order limiting disclosure of the information to those with a need to know for purposes of the litigation. See Hanson, 18 Ariz.App. at 135, 500 P.2d at 920; Ariz. Portland Cement Co. v. Ariz. State T.C., 185 Ariz. 354, 357, 916 P.2d 1070, 1073 (App.1995); Pima County v. Harte, 131 Ariz. 68, 70, 638 P.2d 735, 737 (1981); Cornet Stores v. Superior Court, 108 Ariz. 84, 88, 492 P.2d 1191, 1195 (1972). Further, these interests can be protected at trial through the sealing of the record and (if requested and appropriate) the closing of the courtroom to certain portions of the trial proceedings where the confidential information is discussed. See Ariz. R. Sup.Ct. 123(c)(1) ("public access to some court records may be restricted" to protect confidentiality interests); In re Iowa Freedom of Info. Council, 724 F.2d 658, 661–62 (8th Cir.1983) (permitting trial court to close proceedings to protect confidentiality of trade secrets); Republican Co. v. Appeals Court, 442 Mass. 218, 812 N.E.2d 887, 892 (2004) ("The public's right of access to judicial records, including transcripts, evidence, memoranda, and court orders, may be restricted, but only on a showing of 'good cause.' "). However, we decline to rule out the prospect that in some circumstances the statutory interest in confidentiality may be so great as to completely preclude production of otherwise discoverable information.[7]

---

7. Plaintiff also bases his claim of a violation of privacy issues on constitutional, as contrasted with statutory, grounds. We reject the constitutional argument because it was not raised in the trial court.

### b. *Applying the Standard*

¶ 32 We now turn to the application of this standard to the facts in this case. Applying the first factor, the strength of the relationship between the confidential information and the issue in dispute, we note that the discovery sought is strongly related to the core issue in the litigation: whether the disabilities at issue were caused by Defendants' malpractice or by other sources. Christopher Cunniff, a medical doctor, submitted an affidavit stating that, "to a reasonable degree of medical probability," Patrick's "family history" was a "contributing factor to his alleged disabilities" and that "the characteristics exhibited in Patrick [ ] appear to be familial characteristics."[8] He then opined that Austin's "academic records are relevant and material to my expert review, analysis and consideration of the source and etiology of alleged developmental disabilities found in Patrick." "Familial" characteristics are those "tending to occur in more members of a family than expected by chance alone." *Merriam–Webster's Collegiate Dictionary* 419 (Frederick C. Mish ed., 10th ed.2001). Thus, the affidavit presents evidence from which the trial court could properly conclude that the records were relevant to a core issue in the case: whether Patrick's disabilities are familial characteristics and part of a "family history" that contributed to the alleged disabilities, as contrasted with injuries resulting from any alleged medical malpractice. *See Poole*, 666 N.W.2d at 565 (holding that non-party siblings' school records were relevant because of "expert testimony that genetics may account for some of the symptoms exhibited by the plaintiffs"); *Wepy by Wepy v. Shen*, 175 A.D.2d 124, 125, 571 N.Y.S.2d 817 (N.Y.App.Div.1991) (holding academic records of siblings admissible based on expert affidavit stating that "a possible connection existed between the neurological problems of the plaintiff and those of her siblings, which would support a defense that the injuries sustained by the plaintiff have a genetic cause").[9]

¶ 33 The second and third factors deal with the harm that may result from the disclosure and the ability to limit that harm. The trial court acted properly in considering and safeguarding confidentiality and privacy interests when it (1) conducted an in camera review of the confidential special education records and (2) issued a protective order limiting the dissemination of these records to those with a need to know for purposes of this litigation. Plaintiffs did not show that there would be substantial harm that would occur based on the limited disclosure allowed by the trial court.

¶ 34 As to the fourth factor, there was likewise no showing that this same information could be obtained from a "more convenient" or "less burdensome source."

¶ 35 The fifth factor goes to the relationship between the party seeking to preclude production and that of the party who put the matter at issue: "whether the party seeking to preclude production is the party that put the need for the documents at issue". *Supra* ¶ 30. Here, the records are Austin's, not Patrick's. Austin did not put this matter at issue. Austin's father, on behalf of Patrick (but not Austin), put the matter at issue. This factor weighs in favor of Austin's position. Regardless, once the matter was put at issue by Austin's father,

---

8. We do not hold that an expert affidavit is always necessary to show relevance or discoverability in a case where confidentiality, and thus privacy, interests are at stake. *See Baldwin by Baldwin v. Franklin General Hosp.*, 151 A.D.2d 532, 533, 542 N.Y.S.2d 667 (N.Y.App.Div.1989) (holding that relevance and discoverability of academic records were established by mother's testimony that brother of plaintiff also had speech impairment and learning difficulties requiring special education). That will depend on the nature of the claim and the information at issue.

9. In *Monica W. v. Milevoi*, 252 A.D.2d 260, 685 N.Y.S.2d 231 (N.Y.App.Div.1999), the appellate court affirmed the trial court's decision precluding disclosure of educational records. The court found that the "material is privileged," *id.* at 263, 685 N.Y.S.2d 231, an interpretation of the statute with which we disagree. There was likewise no affidavit presented by an expert, and "the relevance of the requested information to any claim or defense in the action [had] not been established." *Id.* These are facts substantially different from those in the case at hand.

**458**

Austin's educational records going to familial characteristics became relevant, as set forth by Dr. Cuniff and determined by the trial court. We emphasize that there is no issue here as to whether the medical records privilege held by Austin has been waived; the trial court expressly precluded production of those documents.[10]

¶ 36 Applying these factors, there is nothing that leads us to conclude that the trial court abused its discretion in allowing production of these documents on a restricted basis. In fact, the production after an in camera review, with limitations based on a "need to know" basis, is virtually a textbook description of how such a discovery matter should be handled.

### Conclusion

¶ 37 For the foregoing reasons, we affirm the order of the trial court regarding the discovery of the special education records at issue in this special action.

CONCURRING: PATRICIA K. NORRIS, Presiding Judge and JON W. THOMPSON, Judge.

---

**10.** When a minor child's parents file a medical malpractice action on the child's behalf, the parents, as legal guardians, hold the physician-patient privilege. *See Duquette v. Superior Court*, 161 Ariz. 269, 272 n. 5, 778 P.2d 634, 637 n. 5 (App.1989). The parents thus have the right to waive the privilege. *See id.* (holding that parents of minor child waived physician-patient privilege of child by putting child's medical condition at issue). Other states have held that a parent who brings a medical malpractice action on behalf of one child does not waive the physician-patient privilege in favor of the child's siblings. *See Kunz v. S. Suburban Hosp.*, 326 Ill.App.3d 951, 260 Ill.Dec. 687, 761 N.E.2d 1243, 1247–48 (2001); *Scharlack v. Richmond Mem'l Hosp.*, 102 A.D.2d 886, 887–88, 477 N.Y.S.2d 184 (1984). The issue is not presented for our review here, as we deal with records that are confidential but subject to disclosure, as contrasted with medical records that are not subject to disclosure if there is a privilege that has not been waived.